**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dianna Rae Kollmeyer, | No. CV-17-02749-PHX-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Dianna Rae Kollmeyer, proceeding pro se, seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for benefits under the Social Security Act (the "Act"). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Rule 16.1 of the Local Rules of Civil Procedure. As discussed below, the Court affirms the Commissioner's decision.

## I. Procedural Background

On March 11, 2014, Plaintiff applied for supplemental security income ("SSI") alleging a disability onset date of October 20, 2012. (Tr. 14.)[1] After Plaintiff's application was denied on initial review, and on reconsideration, she requested a hearing before an administrative law judge ("ALJ"). (*Id.*) In February 2016, an ALJ conducted a video hearing at which Plaintiff appeared and testified with a representative, paralegal Jennifer

---

[1] Citations to the "Tr." are to the certified administrative transcript of record. (Doc. 18.)

Hornback.[2]  (*Id*.)  At the hearing, Plaintiff, through her representative, amended the onset date to March 11, 2014.  (Tr. 14, 85-86.)  Following the hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act.  (Tr. 14-29.)  The ALJ noted that Plaintiff had a previous application for SSI but did not request to reopen any prior application.  (Tr. 14.)  The ALJ also noted that although SSI is not payable until the month after the application was filed, she considered the complete medical history consistent with 20 C.F.R. § 416.912(d).  (*Id*.)  Plaintiff requested review of the ALJ's decision.  (Tr. 1-6.)  The Social Security Appeals Council denied Plaintiff's request for review and Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

## II.    Administrative Record

The administrative record includes medical records pertaining to the history of diagnoses and treatment of Plaintiff's alleged impairments.  The record also includes several medical opinions.  The Court discusses the relevant records and opinions below.

### A.    Treatment Records related to Mental Impairment

#### 1.    Marc Community Resources and SMI Determination

Plaintiff received treatment for mental health conditions at Marc Community Resources ("MCR") stating in 2008.  (Doc. 25 at 8; Tr. 944.)  Plaintiff was diagnosed with depressive disorder NOS, dysthymic disorder, post-traumatic stress disorder ("PTSD"), borderline personality disorder, and obesity.  (Tr. 921, 927, 944, 962, 963.)  Plaintiff reported lifelong depression with increasing anxiety.  (Tr. 538.)  Plaintiff regularly reported suicidal thoughts and difficulty coping with life's stressors.  (Tr. 294, 918, 927, 944.)  Plaintiff reported a family history of mental illness and substance abuse and that she had been sexually and verbally abused by her father, brother, and ex-husband.  (Tr. 918, 944.)

In August 2015, Plaintiff reported that she was intermittently living at her ex-husband's home and her parents' home to take care of her children.  (*Id*.)  She reported that each place was a source of stress.  (*Id*.)  Plaintiff reported "self-injurious behavior—hitting

---

[2]  Plaintiff was represented by attorney Kevin Rowe but he did not appear at the administrative hearing.  (Tr. 83.)

self in head and peeling skin on her feet to the point she cannot walk." (Tr. 944.) Plaintiff had a history of "numerous failed trials of various psychiatric medications." (Tr. 918.) Plaintiff reported medication side effects of hypersomnia, daytime drowsiness, and increased appetite. (Tr. 373, 388, 602.)

On June 23, 2015, nurse practitioner ("NP") Roderick at MCR conducted a mental status examination and noted that Plaintiff was oriented, alert, had good eye contact, normal speech, an unremarkable thought process, and logical associations. (Tr. 919.) She had a full fund of knowledge, but poor memory, insight, judgment, and concentration. (*Id.*) During a July 2015 appointment at MCR, Plaintiff reported feeling increasingly suicidal since a change in her medication. (Tr. 927.) NP Roderick restarted Plaintiff on Cymbalta and Valium. (*Id.*)

On the suggestion of treatment providers at MCR, Plaintiff was evaluated for a Seriously Mentally Ill ("SMI") determination. (Tr. 927, 928-958.) Based on that examination, in August 2015, the Crisis Response Network ("CRN") approved Plaintiff for SMI eligibility. (Tr. 960.) Accordingly, Plaintiff stopped treatment at MCR and her care was transferred to Partners in Recovery. (Tr. 966, 720-22.) The September 2015 discharge summary from MCR noted that Plaintiff appeared to have "declined in progress" based on her GAF scores. (Tr. 966.)

### 2. Partners in Recovery

In August 2015, Plaintiff began treatment with various providers at Partners in Recovery. (Tr. 720.) On examination, Plaintiff was oriented, alert, had normal speech, a tangential thought process, logical associations, a labile mood, appropriate affect, a fair fund of knowledge, fair memory, and poor judgment, insight, and concentration. (Tr. 722.) Plaintiff had a normal gait. (*Id.*) Plaintiff reported daily thoughts of death. (*Id.*) During a September 2, 2015 appointment, Plaintiff reported that she had started taking more Diazepam than ordered and that she had increased her use of medical marijuana. (Tr. 723.) Judith Bischoff, NP, prescribed Latuda 80mg and Diazepam 2mg. (*Id.*) Plaintiff was diagnosed with mood disorder, bipolar NOS, and post-traumatic stress disorder. (*Id.*)

During a September 9, 2015 appointment with NP Bischoff, Plaintiff reported that she thought the Latuda was making her symptoms worse. (Tr. 730.) On examination, Plaintiff was oriented, alert, and had fair eye contact. (Tr. 731.) Plaintiff had logical associations, unremarkable stream of thought, an anxious mood, a labile affect, a fair fund of knowledge, fair memory, fair insight, fair judgment, and poor concentration. (*Id*.) Plaintiff had a normal gait. (*Id*.) Plaintiff reported experiencing palpations as a side effect. (*Id*.) Plaintiff's current medications were identified as Diazepam 2mg and Gabapentin 300 mg. (*Id*.)

During a September 24, 2015 appointment, Plaintiff reported that she had stopped Latuda and that she was taking Gabapentin, but it was not helping. (Tr. 733.) Plaintiff also reported that she had stopped taking Valium. (*Id*.) Plaintiff reported no side effects from her medication. (Tr. 734.) Plaintiff's current medications were identified as Gabapentin 400 mg and Buspirone 30 mg. (*Id*.) On examination on October 22, 2015 Plaintiff was oriented, alert, had good eye contact and normal speech, her stream of thought was unremarkable. (Tr. 737.) Plaintiff had fair memory and fair fund of knowledge. (*Id*.) Her insight, judgment, and concentration were poor. (*Id*.) Plaintiff had a normal gait and normal strength and muscle tone. (*Id*.) Plaintiff reported medication side effects of dizziness and nausea. (*Id*.) Plaintiff's current medications were Gabapentin 400mg and Hydroxyline Pamoate 100mg. (Tr. 738.) During an October 21, 2015 appointment, Plaintiff reported "passive" thoughts of not wanting to live. (Tr. 740.) She had a good fund of knowledge, her memory was grossly intact, and her insight, judgment, and concentration were fair. (*Id*.) Plaintiff had a steady gait. (*Id*.) Plaintiff's medications were modified to target depression, anxiety, and PTSD. (*Id*.)

During November 17, 2015 appointment with Arashdeep Gill, M.D., Plaintiff reported anxiety, depression, and nightmares. (Tr. 743.) Dr. Gill adjusted Plaintiff's medication but denied her request for Benzodiazepine noting that Plaintiff had taken it in the past and it presented short term and long-term risks. (*Id*.) During the November 17, 2015 appointment, Plaintiff reported being anxious and depressed, having fragmented

sleep, passive suicidal thoughts, and reported self-cutting the previous week. (*Id.*) Plaintiff reported that she was unable to attend planned therapy due to transportation issues. (Tr. 744.) Plaintiff did not report any medication side effects. (Tr. 745.) Plaintiff reported that she had previously used medical cannabis twice a week, but she denied recent use. (*Id.*) On examination, Plaintiff was oriented, alert, had good eye contact and normal speech, her stream of thought was unremarkable, her affect was congruent, she had a good fund of knowledge, her memory was grossly intact, she had fair judgment, insight, and concentration. (*Id.*) She had a steady gait. (*Id.*) She was positive for chronic back pain and anxiety. (*Id.*)

During a December 7, 2015 appointment with Dr. Gill, Plaintiff was oriented, alert, had good eye contact, a concrete thought process, and an unremarkable stream of thought. (Tr. 749.) Plaintiff had a good fund of knowledge, her memory was "grossly intact," her judgment, insight, and concentration were fair ("more goal directed"). (*Id.*) Plaintiff had a steady gait. (*Id.*) During a December 17, 2015 appointment with Dr. Gill, Plaintiff reported anxiety and poor sleep. (Tr. 753, 754.) On examination, Plaintiff was oriented, alert, had an unremarkable stream of thought, a good fund of knowledge, grossly intact memory, and fair insight, judgment, and concentration ("more goal directed than her first few appts"). (Tr. 754.) Plaintiff had a steady gait. (*Id.*) Plaintiff was positive for chronic back pain and anxiety. (*Id.*) She was assessed with mood disorder NOS, PTSD, depressive disorder. (Tr. 756.)

## B. Treatment Records Related to Physical Impairments

Plaintiff was treated by several providers as the McKellips Family Clinic. (Tr. 662-712.) Carl E. Ferguson, D.O., diagnosed bilateral sensorineural hearing loss. (Tr. 670, 671, 683.) Dr. Ferguson also treated Plaintiff for neck and back pain. (Tr. 683-86.) On January 15, 2105, Plaintiff complained of sharp shooting neck pain. (*Id.*) On examination, Plaintiff's cervical spine had a decreased range of motion. (Tr. 685.) Plaintiff was alert and oriented and had a normal mood and affect. (*Id.*) Dr. Ferguson diagnosed cervicalgia, lumbago, myalgia, and hearing loss. (Tr. 685.) On January 28, 2015, Dr. Ferguson ordered

a lumbar MRI. (Tr. 687-88; *see* Tr. 620-21.) The MRI revealed mild multilevel spondylitic change in the lumbar spine without evidence of stenosis or root impingement, "probable small Tarlov cyst formation," and mild chronic "endplate compression deformities [at] T12 and L1." (Tr. 621.) During at February 3, 2015 appointment, Plaintiff reported sharp stabbing low back pain at a level 9/10. (Tr. 689.) On examination, Plaintiff's lumbar spine was tender to palpation "with spasm." (Tr. 691.) Dr. Ferguson observed tight paravertebral muscles and decreased "DTR." (*Id*.) Straight leg raising test was negative. (*Id*.) Plaintiff was alert and oriented with a normal mood and affect. (*Id*.)

During a March 13, 2015 appointment with Physician Assistant ("PA") Michelle Roy, Plaintiff complained of throbbing, diffuse back pain at a level 6/10. (Tr. 697.) Plaintiff denied any medication side effects. (*Id*.) On examination, Plaintiff's lumbar spine was tender on palpation. (Tr. 699.) Plaintiff had tight paravertebral muscles and decreased "DTR." (*Id*.) Straight leg raising test was negative. (*Id*.) Plaintiff was alert and oriented with a normal mood and affect. (*Id*.) During a May 2015 appointment with PA Roy, Plaintiff reported sharp aching low back pain at a level 10/10. (Tr. 701.) Plaintiff also presented with hypertension and anxiety. (*Id*.) On examination, Plaintiff was alert and oriented with a normal mood and affect. (Tr. 703.) On June 9, 2015, PA Roy noted that Plaintiff reported stabbing pain in her low back level 8/10, depression, and hypertension. (Tr. 705.) On examination, Plaintiff was alert and oriented with a normal mood and affect. (Tr. 707.)

On referral from Dr. Ferguson, Plaintiff was treated for back pain at Arizona Spine. (Tr. 622-30.) During her initial visit with Daniel Ryklin, M.D., on September 22, 2015, Plaintiff complained of sharp, shooting, stabbing low back pain at a level 10. (Tr. 623.) Plaintiff reported that the pain was aggravated with sitting and standing. (*Id*.) On review of Plaintiff's lumbar MRI, Dr. Ryklin noted that Plaintiff had "fairly preserved disc anatomy, no central canal foraminal stenosis." (*Id*.; *see* Tr. 620-21.) Plaintiff had "multilevel facet hypertrophy as well as facet joint effusions." (Tr. 623.) Plaintiff reported that she had been using "high-dose Gabapentin without much relief," and had tried

Tramadol without relief.  (*Id.*)  Dr. Ryklin noted that Partners in Recovery was "prescribing current pain meds."  (Tr. 624.)  Plaintiff's current medications were Gabapentin and Valium.  (*Id.*)  Plaintiff admitted having recently tried medical marijuana for pain.  (*Id.*)  Plaintiff consented to a urine drug screen.  (*Id.*)  Dr. Ryklin reviewed the results with Plaintiff and noted that the screen was positive for benzodiazepines (BZO) and marijuana (THC).  (Tr. 624, 628-30.)

On examination, Plaintiff was positive for back pain, but negative for muscle cramps, joint swelling, and joint stiffness.  (Tr. 625.)  Plaintiff was able to heel-walk and toe-walk without difficulty.  (*Id.*)  Plaintiff could perform a full squat and climb on the examination table without difficulty.  (*Id.*)  There was tenderness to palpation over the bilateral facet joints in the lumbar spine, range of movement in the lumbar spine "produced pain in the lower lumbar region which [was] consistent with [Plaintiff's] symptoms.  (Tr. 626.)  Straight leg raising test was negative bilaterally "with the exception of producing centralized axial back pain."  (*Id.*)  Dr. Ryklin recommended a "trial of medial branch blocks under fluoroscopy to establish a more definitive diagnosis," and possible lumbar radiofrequency medial branch ablation to provide longer lasting pain relief.  (*Id.*)  Dr. Ryklin prescribed Norco for back pain and advised Plaintiff not to use medical marijuana while on Norco.  (*Id.*)

Plaintiff also sought treatment at urgent care or an emergency room for back pain, knee pain, upper respiratory infections, cold and sinus problems, anxiety, and chest pain.  (Tr. 406, 632-37 (sinus problems), 651-54 (emotional problems), 758-858 (May 28, 2018, various issues treated at Banner Health).)  In her opening brief, Plaintiff refers to "other relevant evidence" of physical impairments.  (Doc. 25.)  Plaintiff asserts that "many years ago" she had pre-cancerous cells that were discovered during a hysterectomy, but she did not follow-up on that issue.  (Doc. 25 at 13-14.)  Plaintiff also asserts that she has a "female condition that requires care" but states that she refuses to see a specialist for treatment.  (*Id.* at 14.)

## C.    Opinion Evidence

### 1.    Nicole Huggins, Psy.D.

On April 10, 2013, Dr. Huggins with Trilogy Integrated Psychological Services performed a consultative psychological examination of Plaintiff.   (Tr. 25, 279-87.) Dr. Huggins noted that Plaintiff was seeking Social Security disability benefits based on her reported difficulties with severe depression and anxiety.   (Tr. 279.)   Dr. Huggins conducted a clinical interview with Plaintiff, performed a "mini mental status examination" ("MMSE), and reviewed a psychological evaluation report from Dr. Kathy Thomas. (Tr. 280, 281.)   Dr. Huggins considered Plaintiff's history of her present illness, episodes of decompensation, her social history, family and relationship history, mental health and medical treatment history, substance abuse history, "legal history," educational history, employment and financial management history, activities of daily living, and mental status. (Tr. 280-82.)

Dr. Huggins noted that Plaintiff was diagnosed with depression and anxiety when she was seventeen.   (Tr. 280.)   Plaintiff reported that her symptoms of depression had increased significantly over the past few years making it difficult for her to work or engage in activities of daily living.   (*Id*.)   Plaintiff described her symptoms of depression as thoughts of not wanting to be alive daily.   (*Id*.)   She described her symptoms of anxiety as "tightness in her chest, shortness of breath, intrusive thoughts causing panic attacks."   (*Id*.) Plaintiff reported self-mutilation by picking or peeling her skin to relieve anxiety. (Tr. 282.)   Plaintiff reported a history of paternal alcohol and child abuse.   (*Id*.)   Plaintiff reported that she lived at home with her ex-husband and his mother and four of her children. (Tr. 283.)   Plaintiff reported that she cooked for them.   (*Id*.)   Plaintiff reported having difficulty maintaining her hygiene due to her depression.   (*Id*.)

Dr. Huggins diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder "by history," and thyroid issues.   (*Id*.)   She noted Plaintiff's problems with employment, housing and finances, and she assessed a GAF score of 65.   (*Id*.)   Dr. Huggins stated that Plaintiff's prognosis was "fair to good" and that she "would benefit from

intensive psychological treatment." (*Id*.) Based on her interview and MMSE of Plaintiff, Dr. Huggins completed a Psychological/Psychiatric Medical Source Statement ("MSS"). (Tr. 285-86.) She opined that Plaintiff had limitations that were expected to last twelve months from the date of her examination. (Tr. 285.) In areas of understanding and memory, Dr. Huggins opined that Plaintiff "demonstrated mostly adequate verbal comprehension and ability to use language" and that her "verbal and visual memory systems appear[ed] to be adequate." (*Id*.) In areas of sustained concentration and persistence, Dr. Huggins opined that Plaintiff could carry out "simple procedures." (*Id*.) Plaintiff "did not demonstrate difficulty sustaining attention during the interview and MMSE." (*Id*.) In the areas of social interaction, Plaintiff reported no significant difficulties getting along with others or co-workers in previous jobs. (*Id*.) When "motivated to do so," Plaintiff could maintain personal hygiene and participate in household activities. (*Id*.) In the area of adapting to change, Dr. Huggins opined that Plaintiff did not demonstrate difficulty with attention and concentration during the interview and the examination. (*Id*.)

### 2. Bradley Werrell, D.O.

In early 2013, Dr. Werrell performed a consultative examination. (Tr. 272-78.) He noted that Plaintiff reported a history of low back pain since 2011. (Tr. 272.) Plaintiff reported that a chiropractor had recommended treatment for her "unusual spinal curvature," but she was unable to afford the treatment. (*Id*.) Dr. Werrell observed that Plaintiff had an "unusual affect." (Tr. 273.) Plaintiff also had "mild difficulty" hearing conversation at "normal conversational tones." (*Id*.) On examination, Dr. Werrell observed that Plaintiff had an unencumbered gait and that she performed tandem walking and heel and toe walking without difficulty. (*Id*.) Plaintiff could squat to 90 degrees and return to standing without using her upper extremities. (*Id*.) Plaintiff could hop "minimally well." (*Id*.) A Rhomberg test was negative. (*Id*.) Plaintiff had full range of motion bilaterally in her upper and lower extremities and in her "axial skeleton." (Tr. 274.) Plaintiff had normal muscle strength, tone, and bulk. (*Id*.) Plaintiff had intact sensation. (*Id*.) Straight leg raising test was negative, but Plaintiff had "reduced spinal curvature throughout the entire

trunk." (*Id*.)  Based on his examination, Dr. Werrell opined that Plaintiff did not have a physical condition that would impose any limitations for twelve continuous months. (Tr. 274.)  Dr. Werrell did not assess any limitations on a medical source statement of ability to do work-related physical activities.  (Tr. 274-77.)

### 3.    Michael Alberti, M.D.

In July 2014, Dr. Alberti examined Plaintiff.  (Tr. 409-11.)  Dr. Alberti noted that Plaintiff's affect was "slightly flat" but she was cooperative and moved without difficulty. (Tr. 410.)  On examination, Dr. Alberti observed that Plaintiff had a normal range of motion in her spine and joints.  (Tr. 410-11.)  Straight leg raising was normal.  (Tr. 411.) Plaintiff had normal (5/5) muscle strength, tone, and bulk.  (*Id*.)  Plaintiff had intact sensation and reflexes.  (*Id*.)  Dr. Alberti opined that Plaintiff did not have physical conditions that would impose any limitations for twelve continuous months.  (Tr. 411.) Dr. Alberti did not assess any limitations.  (Tr. 409-11.)

### 4.    Treating Source Statement

The record includes a February 3, 2015 medical source statement ("spinal/arthritic dysfunction").  (Tr. 601-07.)  The ALJ referred to this statement as a "treating source statement" completed by an unidentified individual associated with the McKellips Family Medical Clinic. (Tr. 17.)  As the ALJ noted, it is difficult to read the signature and the statement does not otherwise identify its author.  (Tr. 607.)  Therefore, the Court refers to this as a treating source's statement.  The treating source identifies Plaintiff's diagnosis as T12/L1 endplate fractures, "DOB L-spine" with a fair prognosis.  (Tr. 601.)  The treating source opined that Plaintiff could, for each activity, sit, stand, or walk for one hour during an eight-hour day and could not perform a job that had a sit/stand option.  (Tr. 605, 606.) Plaintiff could occasionally lift and carry upon to ten pounds.  (*Id*.)  Plaintiff could never bend, squat, crawl, climb, or reach above shoulder height.  (Tr. 606.)  Additionally, Plaintiff was totally restricted in exposure to unprotected heights, machinery, and marked changes in temperature and humidity, dust, fumes, and gases.  (*Id*.)

The treating source opined that Plaintiff's pain and symptoms precluded full-time work because they, or side effects from related medications, impaired her ability to concentrate and sustain effort. (*Id.*) Additionally, Plaintiff would need frequent breaks that could not be accommodated on a regular schedule and she would frequently miss work. (*Id.*)

### III. The Administrative Hearing

Plaintiff was born in 1969. (Tr. 154.) She attended, but did not complete, high school and had past work as a housekeeper and a stay-at-home mother. (Tr. 171, 282, 283.) Plaintiff testified that she was divorced and had three dependent children. (Tr. 87.) Plaintiff testified that her source of income at the time of hearing was "disability" from her ex-husband. (Tr. 87-88.) Plaintiff testified that she had completed ninth grade and did not have a GED. (Tr. 88.) Plaintiff stated that she was not looking for work because she was "trying to stay alive" and constantly wanted to kill herself. (*Id.*) Plaintiff testified that she last worked a few years before the date of the hearing as a housekeeper in a rehabilitation hospital. (*Id.*) She worked there for a year-and-a-half. (Tr. 89.) Plaintiff testified that she left that job because she started having problems with her physical and mental health. (*Id.*)

Plaintiff testified that she was unable to work because she was preoccupied by persistent suicidal thoughts. (*Id.*) Plaintiff testified that when she had suicidal thoughts she cut or hit herself. (Tr. 92.) Plaintiff testified that she engaged in that behavior at least once a day. (*Id.*) Plaintiff testified that she had PTSD related to childhood sexual abuse. (Tr. 93.) Plaintiff stated that she had flashbacks about fifteen to twenty times a day that made her cry, hide, or hurt herself. (*Id.*) She testified that her medication made her extremely drowsy and dizzy. (*Id.*) Plaintiff testified that she had stopped smoking, did not drink alcohol, and had tried "medical marijuana" for her depression but it did not work. (Tr. 90.)

Plaintiff testified that she had fractures in her spine that caused numbness and severe pain. (*Id.*) Plaintiff stated that she had started treatment for her back pain but had stopped after she changed insurance and lost her doctor. (Tr. 93.) Plaintiff intended to get treatment

for her back pain after she got her mental health under control. (*Id.*) Plaintiff testified that she could sit for twenty minutes, stand for fifteen or twenty minutes, walk one block, and lift twenty pounds. (Tr. 90-91.) Plaintiff testified that she spent the day sleeping. (Tr. 91.) She did not do housework or cook. (*Id.*) Plaintiff lived with her mom and dad and her mom did the housework, most of the cooking, and reminded Plaintiff to attend to her personal hygiene. (Tr. 91, 95.) Plaintiff testified that she made sure her children got to school on time. (*Id.*) Plaintiff testified that she drove "sometimes" when it was close to home. (Tr. 87.)

A vocational expert ("VE") also testified at the administrative hearing. (Tr. 95-99.) In response to a question from the ALJ, the VE testified that an individual who had no exertional limitations, but who was limited to simple, unskilled work, who could tolerate only moderate noise and must avoid exposure to "concentrated loud noises," and who was limited to "intermittent, brief, work-related contact with the public, co-workers, and supervisors," could perform Plaintiff's past work as a housekeeper. (Tr. 97.) An individual with those limitations could also perform other work, including hand packager and linen room attendant. (Tr. 97-98.)

In response to a question from Plaintiff's representative, the VE testified that an individual who would be off task more than ten percent of the day would be unable to perform any of the jobs that the VE had identified. (Tr. 98.) The VE also testified that missing more than two days of work per month would be "unacceptable" in the "lines of work" that the VE had identified. (Tr. 98-99.)

**IV.    The ALJ's Decision**

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (providing a nearly identical standard for supplemental security income disability insurance benefits). To

determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see, e.g.*, *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

### A. The Five-Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her medically determinable impairment or combinations of impairments is severe. 20 C.F.R. §§ 404.1520(b), 404.1520(c), 416.920(b), 416.920(c).  If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five.

At step three, the claimant may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404.  20 C.F.R. §§ 404.1520(a)(4)(iii) and (d), 416.920(d).  If claimant can prove such an impairment, the claimant is presumptively disabled within the meaning of the Act.  (*Id.*)  If not, the ALJ determines the claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  20 C.F.R. §§ 404.1520(g), 416.920(g); *see, e.g.*, *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1222 (9th Cir. 2009) ("The burden of proof is on the claimant at steps one through four but shifts to the Commissioner at step five.").  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.  20 C.F.R. § 404.1520(a); *see, e.g.*, *Garrison*, 759 F.3d at 1011.

///

///

## B.     The ALJ's Application of the Five-Step Evaluation Process

At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 24, 2012—the alleged disability onset date.  (Tr. 16.)   At step two, the ALJ found that Plaintiff had the following severe impairments: "[a] mental impairment variously diagnosed to include depressive disorder NOS [not otherwise specified], post-traumatic stress disorder, borderline personality disorder; and bilateral sensorineural hearing loss.[3]  (20 CFR 416.920(c))."  (*Id*.)   At step three, the ALJ found that Plaintiff's severe impairments did not meet or equal an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926)).  (Tr. 18.)

The ALJ next determined Plaintiff's RFC.  (Tr. 20.)   The ALJ concluded that Plaintiff had the RFC to "perform a full range of work at all exertional levels but with certain nonexertional limitations."  (*Id*.)   The ALJ specified that Plaintiff was limited to "simple, unskilled tasks requiring no more than intermittent brief work related to contact with coworkers, supervisors, and the public."  (*Id*.)   The ALJ further found that that Plaintiff was restricted to exposure to "moderate noise" and must avoid "concentrated exposure to loud noise."  (*Id.*)

At step four, the ALJ concluded that Plaintiff could perform her past relevant work as a housekeeper because it did "not require the performance of work-related activities precluded by claimant's residual functional capacity."  (Tr. 26.)   Alternatively, the ALJ found that based on Plaintiff's age, education, and RFC, Plaintiff could perform "other jobs that exist in significant numbers in the national economy," including linen-room attendant. (Tr. 27-28.)

---

[3] In her reply, Plaintiff assert that the ALJ and the Commissioner "failed to include ADD and Anxiety Disorder."  (Doc. 29 at 2.)  To the extent that Plaintiff asserts a claim based on the failure to find ADD and anxiety disorder sever impairments, the Court will not consider that claims that are asserted for the first time in a reply.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (a "district court need not consider arguments raised for the first time in a reply brief"); *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("[a]rguments not raised by a party in its opening brief are deemed waived").

Therefore, the ALJ concluded Plaintiff was not under a disability as defined in the Act from the onset date through the date of the ALJ's decisions. (R. 35.) Accordingly, the ALJ denied Plaintiff's application for disability benefits. (*Id.*)

## V. Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).

In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted). The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

Furthermore, the court applies the harmless error doctrine when reviewing an ALJ's decision. Thus, even if the ALJ erred, the decision will not be reversed if the error is "inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error is harmless so long as there remains substantial

1  evidence supporting the ALJ's decision and the error "does not negate the validity of the
2  ALJ's ultimate conclusion"); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (stating
3  that "[a] decision of the ALJ will not be reversed for errors that are harmless.").

4  **VI.    Plaintiff's Claims**

5       Plaintiff's opening brief includes multiple issues.  (Doc. 25.)  Plaintiff identified
6  fourteen overlapping issues on the first four pages of her brief.  (*Id*. at 1-4.)  However, she
7  includes additional issues throughout her opening brief.  (Doc. 25.)  The Court identifies
8  and discusses these issues below.

9       **A.    The ALJ Failed to Consider all of Plaintiff's Impairments**

10      Plaintiff alleges that the ALJ erred by failing to consider the combined effects of
11 her impairments.  (Doc. 25 at 23 (citing *Smolen*, 80 F.3d at 1289.)  Specifically, Plaintiff
12 asserts that the ALJ did not consider "factors specifically related to [her] back pain."
13 (Doc. 25 at 23).  Plaintiff does not further elaborate on this claim in her opening brief.[4]

14      The ALJ was required to consider Plaintiff's impairments in combination
15 throughout the disability determination process.  *See Smolen,* 80 F.3d at 1289 (discussing
16 requirement that ALJ consider impairments in combination at step two).  The regulations
17 require an ALJ to consider the combined effects of all impairments both severe and non-
18 severe in formulating an RFC.  *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017)
19 (explaining that "[i]n assessing RFC, the adjudicator must consider limitations and
20 restrictions imposed by all of an individual's impairments, even those that are not
21 'severe.'") (quoting Titles II & XVI: Assessing Residual Functional Capacity in Initial
22 Claims, Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2,
23 1996)); *see also* 20 CFR §§ 416.920(e) (stating that when a claimant's impairment(s) does
24 not meet or equal a listed impairment, the Agency will assess a claimant's RFC "based on
25 all the relevant medical evidence and other evidence in the record . . . ."); 20
26 C.F.R. § 416.945(a)(2) (stating that when assessing a claimant's RFC, the Agency "will

27

28 _____

[4] The Court will not consider Plaintiff's expansion of this claim in her reply to include
additional physical impairments.  (Doc. 29 at 2); *see Zamani* 491 F.3d at 997.

- 16 -

consider all of [a claimant's] medically determinable impairments of which [it] is aware, including your medically determinable impairments that are not 'severe . . . .'").

At step two in this case, the ALJ found that Plaintiff had the following severe impairments: "[a] mental impairment variously diagnosed to include depressive disorder NOS [not otherwise specified], post-traumatic stress disorder, borderline personality disorder; and bilateral sensorineural hearing loss. (20 CFR 416.920(c))." (Tr. 16.) The ALJ considered Plaintiff's back pain with findings that suggested lumbar facet syndrome but found Plaintiff's back impairment not severe. (Tr. 17 (citing Admin. Hrg. Exs. 31F at 5, 36F at 20).) Later in her decision, the ALJ stated that, because she found that Plaintiff's back pain was not a severe impairment, "the remainder of [her] decision [would] be focused on the several mental impairments and hearing loss." (Tr. 21.)

Even if the ALJ erred at step two, as Plaintiff suggests (Doc. 25 at 23), such an error would be harmless. Plaintiff prevailed at step two because the ALJ found several severe impairments and her case proceeded to the remaining steps of the sequential evaluation process. However, when analyzing the remaining steps in the sequential evaluation process, the ALJ was required to consider Plaintiff's back impairment, even though she did not find it severe. *See* 20 C.F.R. § 416.945(a)(2); *see also Buck*, 869 F.3d at 1049 (explaining that "Step Two is merely a threshold determination meant to screen out weak claims . . . It is not meant to identify impairments that should be taken into account when determining the RFC.").

The Court concludes that the ALJ's failure to consider Plaintiff's back impairment when assessing her RFC or when questioning the vocational expert was harmless. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (error is harmless if it is "clear from the record that [the] error was inconsequential to the ultimate nondisability determination" (internal quotation marks omitted); *see Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (any error at step two is considered harmless if the ALJ considered the effects of impairments deemed non-severe in assessing a claimant's RFC). At step two, the ALJ discussed the evidence, opinions, and Plaintiff's symptom testimony related to Plaintiff's

back impairment and found that it did not establish any physical functional limitations. (Tr. 17-18.)   As discussed below in Sections VI.B and C, the ALJ did not err in her consideration of this evidence.

## B.   The ALJ's Assignment of Weight to Medical Opinions

### 1.   Relevant Standards

In weighing medical source opinion evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating physician's opinion.  *Id.*  The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion.  *Id.*; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than opinions from treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ."  *Orn*, 495 F.3d at 631; *see Garrison*, 759 F.3d at 1012 n.11.

///

///

## 2. Opinions Related to Back Impairment

At step two, the ALJ found that Plaintiff had the following severe impairments: "[a] mental impairment variously diagnosed to include depressive disorder NOS [not otherwise specified], post-traumatic stress disorder, borderline personality disorder; and bilateral sensorineural hearing loss. (20 CFR 416.920(c))." (Tr. 16.) The ALJ considered Plaintiff's complaint of back pain with findings that suggested lumbar facet syndrome. (Tr. 17 (citing Admin. Hrg. Exs. 31F at 5, 36F at 20).) The ALJ found that Plaintiff's back impairment was not severe. (Tr. 17.) The ALJ assigned great weight to the opinions of examining physicians Dr. Werrell and Dr. Alberti. (Tr. 17.) The ALJ also considered the February 2015 treating source statement. (*Id.* (citing Admin. Hrg. Ex. 27F at 7).) The ALJ assigned that opinion little weight. (Tr. 17-18.) Plaintiff asserts that the ALJ erred in assigning great weight to Dr. Werrell's and Dr. Alberti's opinions (Doc. 25 at 14, 15), but she does not specifically argue that the ALJ erred in assigning little weight to the February 2015 treating source statement.[5] (Doc. 25 at 3, 14-23.) As set forth below, the Court finds that the ALJ did not err in assigning great weight to Dr. Werrell's and Dr. Alberti's opinions.

### a. Bradley Werrell, D.O.

Dr. Werrell examined Plaintiff in February 17, 2013. (Tr. 272-78.) He noted that Plaintiff reported a history of low back pain since 2011. (Tr. 272.) On examination, Dr. Werrell observed that Plaintiff had an unencumbered gait and that she performed tandem walking and heel and toe walking without difficulty. (*Id.*) Plaintiff could squat to 90 degrees and return to standing without using her upper extremities. (*Id.*) Plaintiff could hop "minimally well." (*Id.*) A Rhomberg test was negative. (*Id.*) Plaintiff had full range of motion bilaterally in her upper and lower extremities and in her "axial skeleton."

---

[5] Plaintiff asserts that the ALJ "discredit[ed] every medical person" aside from the agency physicians. (Doc. 25 at 3, 16.) However, she does not specifically argue that the ALJ erred by assigning little weight to the February 2015 treating source statement and does not identify any error in the ALJ's assessment of that opinion. (Doc. 25.) Plaintiff's conclusory allegations are insufficient to present a claim. *See Independent Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (stating that the court will not consider any claims that were not specifically and distinctly argued in a party's opening brief).

(Tr. 274.)  Plaintiff had normal muscle strength, tone, and bulk.  (*Id.*)  Plaintiff had intact sensation.  (*Id.*)  Straight leg raising test was negative.  (*Id.*)  Dr. Werrell did not believe that Plaintiff's "condition(s) [would] impose any significant limitations for 12 continuous months."  (Tr. 274.)  Dr. Werrell did not assess any limitations on a medical source statement of ability to do work-related physical activities.  (Tr. 274-77.)  The ALJ assigned Dr. Werrell's opinion great weight because she found it consistent with the objective evidence since the application date.  (Tr. 17 (citing Admin. Hrg. Exs. 9F at 4, 10F at 2-3, 32F at 6, 36F at 55).)

In her opening brief, Plaintiff notes that Dr. Werrell indicated that there were "no records for review" and stated that Plaintiff had an "unusual affect."  (Doc. 25 at 15 (citing Tr. 273).)  Plaintiff, however, does not identify a particular error related to the ALJ's assignment of great weight to Dr. Werrell's opinion.  (Doc. 25 at 15.)  As the ALJ noted, other evidence in the record was consistent the Dr. Werrell's opinion.  (*See* Tr. 406 (back nontender, with normal range of motion); Tr. 411 (normal range of motion in the spine); Tr. 636 (normal range of motion, muscle strength, and stability with no pain on inspection); Tr. 812 (normal range of motion in back and no tenderness); *see also* Tr. 625, 722, 739, 740, 749, 754.)  Plaintiff has not shown that the ALJ erred by assigning great weight to Dr. Werrell's opinion.

### b. Michael Alberti, M.D.

Dr. Alberti examined Plaintiff in July 2014 and observed multiple normal results.  (Tr. 409-11); *see* Section II.C.3.  Dr. Alberti opined that Plaintiff did not have physical conditions that would impose any limitations for twelve continuous months.  (Tr. 411.)  The ALJ assigned Dr. Alberti's opinion great weight.  (Tr. 17.)  Plaintiff asserts that Dr. Alberti did not review sufficient medical records.  (Doc. 25 at 14.)  Plaintiff also disagrees with Dr. Alberti's opinion that her "condition would not last longer than 12 months" because her condition "remained active" at the time of the administrative hearing in February 2016.  (*Id.*)

Plaintiff's disagreement with Dr. Alberti's opinion regarding the duration of any limitations caused by her back issues does not establish that the ALJ erred. The ALJ did not rely on that portion of Dr. Alberti's opinion in her assessment of his opinion. (Tr. 17.) Additionally, Plaintiff's assertion that Dr. Alberti did not consider sufficient medical records does not establish that the ALJ erred. Dr. Alberti noted that he reviewed an August 2012 cervical spine x-ray, "which was normal," a June 2013 report of an x-ray of Plaintiff's left knee "which was normal," and a Department of Economic Security Disability Examination report from February 2013. (Tr. 409.) Plaintiff does not identify any other records that Dr. Alberti should have reviewed. (Doc. 25 at 14.) On examination, Dr. Alberti found that Plaintiff had a negative straight leg raising test, normal gait, normal range of motion, normal reflexes, normal muscles strength, tone, and bulk, and normal sensation. (Tr. 410-11.) As the ALJ noted, these findings were consistent with other clinical findings in the record. (Tr. 17, Tr. 636 (normal range of motion, muscle strength, and stability in all extremities with no pain); Tr. 406, 812 (normal range of motion and normal alignment of back with no tenderness); *see also* Tr. 625, 722, 737, 740, 749, 754).) Thus, the ALJ did not err in assigning this opinion great weight.

### c. February 2015 Treating Source Statement

As noted in Section III.C.4, in February 2015, a treating source opined that Plaintiff could sit, stand, or walk for one hour each during an eight-hour day and could not perform a job that had a sit/stand option. (Tr. 605, 606.) Plaintiff could occasionally lift and carry upon to ten pounds. (*Id.*) Plaintiff could never bend, squat, crawl, climb, or reach above shoulder height. (Tr. 606.) Additionally, Plaintiff was totally restricted in her exposure to unprotected heights, machinery, marked changes in temperature and humidity, dust, fumes, and gases. (*Id.*)

The ALJ assigned this opinion little weight. (Tr. 17.) The ALJ noted that there was no response to the first question on the medical source statement, which inquired about the "[f]requency and length of contact" with Plaintiff. (Tr. 17, 601.) The ALJ also noted that the opinion was conclusory. (Tr. 18.) Additionally, the ALJ found that the assessed

limitations were inconsistent with Plaintiff's May 14, 2014 report, which indicated that her conditions did not affect her abilities to lift, squat, bend, stand, reach, walk, sit, or knee. (Tr. 18, Tr. 190.)  The ALJ further noted that although Plaintiff subsequently reported limitations in those areas, those reports were inconsistent with treatment records that were negative for back pain, joint pain, and bone/joint symptoms.  (Tr. 18, Tr. 794 (negative for impaired gait), Tr. 812 (normal range of motion no tenderness).)  The ALJ further noted that the extreme limitations assessed on the February 2015 statement were inconsistent with the treatment records indicating that Plaintiff had a normal gait, normal range of motion, normal muscle strength, and stability in all extremities without pain on inspection. (Tr. 636, 794, 810, 812; see Tr. 625, 722, 737, 740, 749, 754.)

Plaintiff does not specifically argue that the ALJ erred in assigning little weight to February 2015 opinion and has not identified any specific error in the ALJ's assessment of that opinion. (Doc. 25 at 3, 16, 21.)  Moreover, an ALJ may discount medical opinion evidence that is conclusory and inconsistent with the record.  *See Orn*, 495 F.3d at 631; *see Garrison*, 759 F.3d at 1012 n.11.  Thus, the ALJ gave legally sufficient reasons for providing little weight to the February 2015 opinion.

### 3.    Opinion Regarding Mental Limitations—Nicole Huggins, Psy.D.

In 2013, Dr. Huggins examined Plaintiff and completed a Psychological/Psychiatric Medical Source Statement ("MSS").  (Tr. 285-86.)  *See* Section II.C.1.  She opined that the limitations noted in the medical source statement were expected to last for a continuous period of twelve months.  (Tr. 285.)  She opined that Plaintiff's prognosis was "fair to good" and that "[s]he would benefit from intensive psychological treatment."  (Tr. 284.) The ALJ afforded Dr. Huggins' opinion great weight.  (Tr. 25.)  Plaintiff does not specifically challenge the weight the ALJ afforded Dr. Huggins' opinion.  (Doc. 25 at 15.) Rather, as discussed below, she seems to assert that the ALJ disregarded certain aspects of that opinion.

Plaintiff asserts that the ALJ did not acknowledge Dr. Huggins' opinion that she "was indeed disabled and had a disability that would last longer than 12 months."  (Doc. 25

at 15, 16.) Dr. Huggins, however, did not opine that Plaintiff was disabled. (Tr. 279-87.) Rather, she opined that limitations caused by Plaintiff's impairments would be expected to last at least twelve continuous months from the date of examination. (Tr. 285.) (Doc. 25 at 16.) The ALJ did not ignore the durational aspect of Dr. Huggins' opinion because she adopted the limitations that Dr. Huggins assessed into the RFC by limiting Plaintiff to the "performance of simple, unskilled tasks requiring no more than intermittent brief work related [to] contact with coworkers, supervisors, and the public." (Tr. 20, 25; Tr. 285-86.)

Plaintiff also asserts that Dr. Huggins' statement that Plaintiff "would benefit from intensive psychological treatment" indicated that Plaintiff had "ongoing decompensation." (Doc. 25 at 15.) Plaintiff notes that in a section of the report entitled "Episodes of Decompensation," Dr. Huggins stated that Plaintiff's "symptoms of depression [had] increased significantly making it difficult for her to obtain and sustain employment, or engage in daily living tasks." (Doc. 25 at 11 (citing Tr. 280).) At step three of the sequential evaluation process the ALJ found that Plaintiff's severe mental impairments did not meet or equal an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926)). (Tr. 18.) As part of the determination, the ALJ found that Plaintiff had not had any episodes of decompensation of an extended duration since the date of application.[6] (Tr. 20.) For purposes of the step three finding, "[r]epeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least two weeks." 20 C.F.R. § 404, App.1, Subpart P, § 12.00(c)(4).

Plaintiff does not specifically challenge the ALJ's step three finding. (Doc. 25; Doc. 29 at 6-7.) Additionally, to the extent that Plaintiff suggests that Dr. Huggins' opinion was inconsistent with the ALJ's finding about episodes of decompensation, the Court rejects that argument. In April 2013, Dr. Huggins opined that Plaintiff's depression had

---

[6] The ALJ considered whether Plaintiff's mental impairments met or medically equaled the criteria of Listings 12.04, 12.06, and 12.08. (Tr. 19.) In making that finding she considered whether the "paragraph B" criteria were met. (*Id.*) The B criteria included repeated episodes of decompensation. (*Id.*)

significantly increased and that she could benefit from further treatment.  (Tr. 280, 284.)
She did not specifically opine that Plaintiff had experienced any episodes of
decompensation of extended duration since the date she had applied for benefits.  (Tr. 284.)

Plaintiff further suggests that Dr. Huggins' opinion that Plaintiff "would benefit
from intensive psychological treatment" was inconsistent with the ALJ's conclusion that
Plaintiff was not disabled.  Plaintiff asserts that she would be unable to work if she was
taking the time to participate in such treatment.  (Doc. 25 at 15.)  Dr. Huggins, however,
did not opine as to the frequency or duration of such treatment or indicate that the time
needed to participate in such treatment would otherwise preclude sustained work.  (Tr. 284-
86.)  Therefore, the Court concludes that Plaintiff has not established any error related to
the ALJ's assignment of weight to Dr. Huggins' opinion.

### 4.  Non-Examining Physicians' Opinions

On reconsideration of the initial denial of benefits, on November 20, 2014, John B.
Kurtin, M.D., reviewed the record and completed a physical RFC assessment.  (Tr. 127-
28.)  He opined that Plaintiff had no exertional, postural, manipulative, or visual
limitations.  (Tr. 127.)  He opined that Plaintiff had communicative limitations due to
"moderate sensorineural hearing loss."  (*Id*.)  Specifically, Plaintiff needed to "avoid
concentrated exposure" to noise.  (Tr. 127-28.)  The ALJ assigned this opinion great
weight.  (Tr. 25.)  The ALJ incorporated Dr. Kurtin's opinion into the RFC by finding that
Plaintiff must avoid "concentrated exposure to loud noise."  (Tr. 20.)

On November 21, 2014, Andres Kerns, Ph.D., reviewed the record and opined that
the initial decision was appropriate and adopted that decision.  (Tr. 126; *see* Tr. 100-106
(July 2014 opinion of Raymond Novak, M.D.).)  Dr. Kerns completed a mental RFC and
opined that Plaintiff could meet the basic mental and emotional demands of competitive,
unskilled work on a sustained basis and that she "would do best in work setting requiring
minimal social interaction."  (Tr. 128-30.)  The ALJ assigned Dr. Kern's and Dr. Novak's
opinions great weight.  (Tr. 25.)  The ALJ incorporated Dr. Kern's and Novak's opinions
into the RFC by finding that Plaintiff was limited to "simple, unskilled task, requiring no

more than intermittent brief work-related contact with coworkers, supervisors, and the public." (Tr. 20.)

In her opening brief, Plaintiff notes that non-examining physicians Dr. Novak, Dr. Kerns, and Dr. Kurtin did not meet Plaintiff. (Doc. 25 at 14.) The Commissioner does not dispute this point. (Doc. 28 at 10.) "The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."[7] *Thomas v Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Thus, Plaintiff's bare assertion that the non-examining physicians did not meet her does not establish any error.

Plaintiff also suggests that the examining physicians may not have identified the records that were reviewed.[8] (Doc. 25 at 14 (stating that that State agency doctors "reviewed the records (which ones?)").) The record, however, reflects that the State agency physicians identified and summarized the medical records that they reviewed. (Tr. 101-03, 106-07, 111, 119-23, 127-28.) Therefore, Plaintiff has not established any error.

### C. Plaintiff's Symptom Testimony

Plaintiff asserts that the ALJ improperly discredited her symptom testimony. (Doc. 25 at 2, 3, 19, 20.) The Commissioner defends the ALJ's assessment of Plaintiff's symptom testimony. (Doc. 28 at 14-17.) As discussed below, the Court finds that the ALJ provided legally sufficient reasons for rejecting Plaintiff's symptom testimony.

An ALJ uses a two-step analysis to evaluate a claimant's subjective symptom testimony. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "First, the ALJ must determine whether

---

[7] Plaintiff misstates this principle as requiring that, to constitute substantial evidence, the opinion of examining and non-examining physicians must be corroborated by the "rest of the evidence." (Doc. 25 at 22.) Such evidence must be corroborated by other evidence in the record, but not by all the evidence in the record. *See Thomas*, 278 F.3d at 957.

[8] In her reply, Plaintiff states that the non-examining agency physicians "stated that they requested additional records but received none." (Doc. 29 at 8.) Plaintiff does not cite to the portion of the record that supports her statement. She also states that "both doctors" incorrectly referred to a history of seizures and stroke. (*Id*.) Again, Plaintiff does not provide a record cite to support her statement.

the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*)). The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen*, 80 F.3d at 1282. Instead, the claimant must only show that an objectively verifiable impairment "can reasonably produce the degree of symptom alleged." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1160-61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms limit the claimant's ability to work. *See* 20 C.F.R. § 404.1529(c)(1). At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for discounting the symptom testimony. *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

### 1. Alleged "False Accusations"

Plaintiff asserts that the ALJ "made false accusations" to discredit her. (Doc. 25 at 2.) Plaintiff does not identify those accusations. (*Id.*) Plaintiff's conclusory assertion does not establish error.

///

## 2. Discrepancies Regarding Plaintiff's Education

Plaintiff asserts that the ALJ discredited her based on a discrepancy in the record regarding whether Plaintiff completed ninth or eleventh grade. (Doc. 25 at 19.) Plaintiff asserts that she completed ninth grade, but that her attorney during the administrative proceedings incorrectly reported that she completed eleventh grade. (*Id.*) The record reflects that the ALJ did not discredit Plaintiff's symptom testimony based on that discrepancy. (Tr. 24-25.)

However, the ALJ did consider that issue at step five of the sequential analysis. (Tr. 27.) The ALJ is required to consider a claimant's education as part of the step-five analysis. 20 C.F.R. § 416.960(b)(3), (c)(1). At step five, the ALJ considered Plaintiff's level of education and noted the inconsistencies in Plaintiff's educational reports regarding whether she had completed ninth or eleventh grade. (Tr. 27 (citing Admin Hrg. Exs. 2E at 3, 38F at 87).) The ALJ found that Plaintiff had a "limited education." (Tr. 27.) This finding was consistent with the regulations, which provide that an individual has a "limited education" if she has attended school through the eleventh grade. 20 C.F.R. § 416.964(b)(3). Therefore, the discrepancy regarding which grade of high school Plaintiff had completed was inconsequential to the ALJ's conclusion that Plaintiff had a limited education.

## 3. Ability to Observe Plaintiff's Demeanor

Plaintiff asserts that the ALJ's ability to observe the claimant's demeanor is crucial to the credibility determination. (Doc. 25 at 20.) Thus, Plaintiff may be arguing that the ALJ's credibility determination is deficient because the hearing was conducted by video teleconferencing. (Tr. 14 (noting that Plaintiff and her representative appeared by video teleconference and that the ALJ presided from Albuquerque, New Mexico).) The regulations provide for video teleconferencing. *See* 20 C.F.R. § 416.1436(c). Thus, the ALJ did not err by holding a video hearing. Additionally, Plaintiff does not identify any aspect of her demeanor during the administrative hearing that the ALJ was unable to

observe. Therefore, Plaintiff has not established that conducting the administrative hearing by video teleconferencing created an error in the ALJ's credibility determination.

### 4. Inconsistencies Related to Drug Use/Compliance

The ALJ discredited Plaintiff's symptom testimony because she found inconsistencies in the record regarding Plaintiff's cannabis use and compliance with her prescribed medications. (Tr. 24.) Plaintiff asserts that the record does not support this finding because the drug screen evidence is misleading and confusing.[9] (Doc. 25 at 4.)

As part of the overall disability analysis, and in weighing various allegations and opinions, the ALJ must consider whether there are any inconsistencies in the evidence, such as Plaintiff's inconsistent statements. *See* Social Security Ruling 96-7p, 1996 WL 374186, at *5 (stating that a strong indicator of the credibility an individual's statements is their consistency, both internally and with other information in the record).[10] Thus, the ALJ properly considered the inconsistencies in the record statements when assessing the credibility of Plaintiff's symptom testimony. However, as Plaintiff argues, the record does not support the ALJ's conclusion.

The ALJ noted that Plaintiff testified to having used marijuana since the application date and described the use of "medical marijuana" to her provider. (Tr. 24.) The ALJ noted that the records documented cannabis abuse and inconsistent urine drug screening. (*Id.* (citing Admin. Hrg. Exs. 31F at 7; 36 F at 20).) The ALJ stated that the medical records indicate that Plaintiff was taking more Diazepam than was prescribed, increased her use of

---

[9] The Commissioner did not respond to this issue. However, considering the nature of Plaintiff's brief, which made issues difficult to identify, the Court will consider this issue.

[10] After Plaintiff filed her claim, in 2016, the Agency issued Social Security Ruling 16-3p, (SSR 16-3p), which provides new guidance for ALJs evaluating a disability claimant's statements regarding the intensity, persistence, and limiting effects of symptoms. SSR 16-3p, 2017 WL 5180304, at *13. SSR 16-3p replaces Social Security Ruling 96-7p. SSR 16-3p eliminates the term "credibility" used in SSR 96-7p to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2017 WL 5180304, at *1. ALJs apply SSR 16-3p when making determinations and decisions on or after March 28, 2016. *Id.* Thus, SSR 96-7p still applied when the ALJ issued her decision on March 16, 2016. (*See* Tr. 29); 2017 WL 5180304, at *13 n.27.

medical marijuana, and sought treatment with Benzodiazepine, which was denied. (Tr. 24 (citing Admin. Hrg. Ex. 35 F at 7, 27; Ex. 36F at 20).)

In the September 2, 2015 treatment note that the ALJ cited, Plaintiff stated that she had been unable to start on "Latuda as ordered due to the need for prior authorization required by MMIC." (Tr. 723.) The lack of Latuda combined with a decrease in Cymbalta had increased Plaintiff's anxiety and Plaintiff admitted that she was taking more Diazepam than ordered and had increased her use of medical marijuana. At that appointment, the provider reduced Plaintiff's dose of Diazepam.[11] (*Id.*) Considering Plaintiff's admission that she was using medical marijuana, evidence of THC on a September 15, 2015 drug screen does not evidence any inconsistency that discredits Plaintiff's symptom testimony. (Tr. 624.)

However, the ALJ also noted that the drug screen was positive for Gabapentin, Tramadol, and Cyclobenzaprine with no corresponding prescription. (Tr. 24 (citing Admin. Hrg. Ex. 31F at 7).) The drug screen result is inconsistent with other record evidence that indicates Plaintiff was prescribed Gabapentin around the time of the drug screen. (Tr. 624 (current medications Gabapentin and Valium).) Plaintiff cites evidence that she had been prescribed Tramadol but that the prescription had ended in June 2015. (Tr. 704 (stating that prescription for 1 tablet per day for 30 days of Tramadol was to end on June 25, 2015).) She does not cite evidence of a prescription for Cyclobenzaprine.[12] (Doc. 25 at 7-8, 9.)

The Court agrees with Plaintiff that the results of the drug screen were confusing. However, substantial evidence in the record supports the ALJ's conclusion that there was evidence that Plaintiff was taking drugs that were not prescribed or not taking drugs according to the prescription. A failure to follow a prescribed course of treatment is a

---

[11]    Benzodiazepines are a class of drugs used for anxiety and other conditions. Benzodiazepines include Diazepam (Valium), Ozazepam, Clorazepate, Alprazolam (Xanaz), and Chloridiazepoxide. www.rxlist.com lasted visited Jan. 25, 2019.

[12]  Common brand names include Flexeril and Amrix. www.medicinenet.com. Last visited Jan. 25, 2019.

legally sufficient reason for discounting a claimant's credibility.  *See Smolen*, 80 F.3d at 1282.

### 5.  Reason for Leaving Job and Financial Incentive not to Work

The ALJ discounted Plaintiff's symptom testimony because she voluntarily left the work force after she quit working as a housekeeper in 2012.  (Tr. 24 (citing Admin. Hrg. Exs. 20F at 1; 39F at 36).)  Plaintiff does not specifically challenge this rationale.  (Doc. 25 at 20.)  Evidence that a claimant quit working for a non-medical reason is a clear and convincing reason for discounting her symptom testimony.  *See Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001) (concluding that a claimant's pain complaints were not credible because he reported at the administrative hearing and also to at least one doctor, that he left his job because he was laid off, not because he was injured).  Here, an October 2012 treatment note states that Plaintiff reported that she "quit her job because she did not like new management and that most of the people she knew at the workplace either also quit or got fired."  (Tr. 571.)  Thus, this was a legally sufficient reason for the ALJ to discount Plaintiff's symptom testimony.

The ALJ also noted that Plaintiff had little financial incentive to return to work because her earnings history reflected annual earnings, in most years, that were less than Plaintiff's potential yearly entitlement to SSI.  (Tr. 24 (citing Admin. Hrg. Ex. 3D).)  Plaintiff states that she did not pursue an SMI diagnosis and did not actively seek financial support.  (Doc. 25 at 20.)  However, Plaintiff does not argue that the ALJ's conclusion that she had little financial incentive to work was a legally insufficient reason for discounting her credibility.  (*Id.*)  A lack of financial incentive to work is relevant in assessing a claimant's motivation and credibility.  *See Tommasetti v. Astrue*, 533 F.3d 1035 (9th Cir. 2008) (affirming the ALJ's credibility finding that was based in, in part, on a finding that claimant may not have been motivated to work); *see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (stating that in reaching findings the ALJ "is entitled to draw inferences logically flowing from the evidence.").  Thus, Plaintiff has not established that the ALJ erred by relying on this rationale.

### 6.     Daily Activities

The ALJ discounted Plaintiff's subjective complaints because the record was inconsistent with Plaintiff's allegation that she could only pay attention for one minute. The ALJ noted that the record confirmed Plaintiff could "go back and forth between her parent's home and ex-husband's home to take care of the kids," and that she could independently drive to stores to shop for various things. (Tr. 24-25.) The ALJ observed that even if Plaintiff's activities were as limited as she alleged, it appeared that the limited range was "most likely a lifestyle choice and not due to any established impairment." (Tr. 25.)

Plaintiff notes the ALJ's rationale for discounting her subjective complaints, and asserts that the ALJ appeared biased against her.[13] (Doc. 25 at 20.) However, Plaintiff does not otherwise assert any error based on this rationale. (*Id*.) Additionally, when assessing a claimant's symptom testimony, and ALJ properly considers inconsistencies between the alleged symptoms and the claimant's activities. *Smolen*, 80 F.3d at 1284; *Lingenfelter*, 504 F.3d at 1040. An ALJ may reject a claimant's symptom testimony if the severity of the alleged symptoms is incompatible with the claimant's daily activities. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). As the ALJ noted, Plaintiff's alleged inability to pay attention for more than one minute is inconsistent with evidence that she independently drove and went shopping. Thus, the ALJ properly discounted Plaintiff's symptom testimony as inconsistent with her reported activities.

### 7.     Inconsistencies with the Medical Record

Plaintiff asserts that the ALJ discredited her with "factless (sic) irrelevant evidence." (Doc. 25 at 3.) Plaintiff does not clearly articulate this argument. However, she may be arguing that the ALJ improperly discounted Plaintiff's symptom testimony because she found that the record did not support, or was inconsistent with, Plaintiff's claims. (Tr.18, 21-25.) Contradiction with the medical record is a sufficient basis for rejecting a claimant's

---

[13] To support her allegation that the ALJ was biased against her, Plaintiff states that a paralegal at her attorney's firm stated that the ALJ denied benefits because Plaintiff was "a fat, lazy drug addict with bad habits." (*Id*., Doc. 29 at 11.) This alleged statement is not attributed to the ALJ and, thus, does not indicate bias on the part of the ALJ.

subjective testimony. *Johnson v. Shalala*, 60 F.3d 1428, 1433-34 (9th Cir. 1995) (noting that the ALJ identified several contradictions between claimant's testimony and the medical evidence and within the claimant's own testimony and affirming the ALJ's credibility determination). Substantial evidence in the record supports the ALJ's conclusion that the objective evidence was inconsistent with Plaintiff's testimony. For example, Plaintiff testified that she could only pay attention for one minute at a time and that her impairments affected her ability to concentrate and her memory. (Tr. 21, 190.) However, the medical record showed that Plaintiff had only "slight" or "some" difficulty with short-term and working memories (Tr. 283-83, 285), and that her memory skills were "intact." (Tr. 284.) The medical record also showed that Plaintiff did not demonstrate "difficulty sustaining attention to task." (Tr. 285.) Additionally, the ALJ further noted that although Plaintiff reported physical functional limitations, her reports were inconsistent with treatment records that were negative for back pain, joint pain, and bone/joint symptoms and showed normal gait, normal range of motion, normal muscle strength, and stability in all extremities without pain on inspection. (Tr. 18, Tr. 636 794, 810, Tr. 812; *see* Tr. 625, 722, 737, 746, 749, 754.)

### D. Lay Opinions

#### 1. Opinion of Plaintiff's Mother

Plaintiff asserts that the ALJ discredited her mother's opinion that Plaintiff slept all day and her statements "regarding [Plaintiff's] back problem and medication use." (Doc. 25 at 1, 19.) Plaintiff's mother, LaRae Darling, completed a function report on May 22, 2014. (Tr. 177-84.) She stated that she saw Plaintiff "1 x week" to "get groceries." (Tr. 177.) She stated that Plaintiff "slept a lot" due to her anti-depressant medication. (*Id.*) She stated that Plaintiff had worked for a housekeeper for one year at Health South Rehab but that she could not do that job anymore because of her back. (Tr. 178.) Darling stated that Plaintiff could lift up to fifteen pounds and that lifting and bending hurt Plaintiff's back. (*Id.*) Darling estimated that Plaintiff could walk a "short distance" before needing to stop and rest for five minutes. (*Id.*) She could pay attention for "1-2 min" and did not

finish what she started. (*Id.*) Darling indicated that Plaintiff's living situation was "bad." (Tr. 183.) Darling stated that Plaintiff had lost interest in her appearance, but still did basic hygiene. (*Id.*) Plaintiff's mother called Plaintiff daily to remind her to take her medication. (*Id.*) She stated that Plaintiff made simple meals and did light cleaning "in between naps." (*Id.*) She stated that Plaintiff left the house to take her children to school, to shop for groceries, children's clothing, and school supplies, and to occasionally go to church. (Tr. 180, 181.) However, Plaintiff "did not like to go where there [were] a lot of people." (Tr. 182.)

The ALJ gave little weight to Darling's report of Plaintiff's functional limitations and her inability to work. (*Id.*) The ALJ discounted those reports because Darling indicated that she only saw Plaintiff once a week to go grocery shopping and because she lacked the medical training to assess physical limitations. (*Id.*) The ALJ further stated that she gave little weight to Darling's statement regarding Plaintiff's limitations because they were not consistent with or supported by the medical record. (*Id.* (citing Admin. Hrg. Exs. 12F at 3, 15; 13F at 2; 32F at 6, 21; 33F at 20, 24, 42, 46; 34F at 4).)

"[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence . . . and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis in original) (internal citations omitted). To reject the testimony of a lay witness, an ALJ must present "reasons germane to each witness for doing so." *Lewis v. Apfel*, 236, F.3d 503, 511 (9th Cir. 2001). A lay witness, however, "can only speculate as to whether plaintiff is employable." *Kirk v. Berryhill*, 2018 WL 6601084, at *4 (D. Oregon Dec. 17, 2018). Thus, the ALJ properly discounted Darling's opinion on Plaintiff's ability to work. Additionally, an ALJ may discount lay witness testimony that conflicts with medical evidence. *Lewis*, 236 F.3d at 511.

Additionally, Darling reported that she only saw Plaintiff once a week to go grocery shopping.[14] (Tr. 177.) Thus, as the ALJ concluded she did not observe Plaintiff on a

---

[14] Plaintiff asserts that during the February 2016 administrative hearing she testified that she lived with her mom. (Doc. 29 at 5.) Plaintiff's mom, Darling, completed her function

regular basis, which is a germane reason to discount her opinion. *See Thompson v. Colvin*, 2016 WL 6471399, at *7 (D. Ariz. Nov. 2, 2016).

### 2. Ex-husband's Questionnaire

Plaintiff also asserts that the ALJ "mysteriously" did not have her ex-husband's questionnaire. (Doc. 25 at 3.) Plaintiff, however, does not identify the date or describe the content of that document. (*Id*.) Plaintiff has not established any error based on her assertion that a statement from her ex-husband was allegedly missing from the administrative record before the ALJ.

### E. Other Issues

### 1. The ALJ Ignored or Failed to Clarify Evidence

Plaintiff asserts that the ALJ "ignored testimony presented" at the hearing, including "major facets" of Plaintiff's medical conditions, her "unstable living situation," her "never-ending problems" with her children, and failed to review the entire record. (Doc. 25 at 1-3.) Plaintiff also asserts that the ALJ did not ask any questions to clarify "discrepancies" in the record. (Doc. 25 at 1.) These conclusory assertions are unsupported.

The ALJ stated that she considered the entire record, "including the claimant's hearing testimony, and the "medical and other evidence in the claimant's case." (Tr. 16, 26.) In her decision, the ALJ discussed the testimony at the administrative hearing (Tr. 21, 23, 27), medical evidence related to Plaintiff's mental and physical impairments (Tr. 17-23), and opinion evidence. (Tr. 17-18, 25-26.) The ALJ also discussed Plaintiff's "familial and interpersonal stressors," which included her living situation and issues related to her children. (Tr. 22.) Plaintiff does not identify the testimony, or the "facets" of her medical conditions, or other evidence that the ALJ allegedly ignored or the discrepancies that the ALJ failed to clarify. (Doc. 25 at 1-3.) Plaintiff has not established that the ALJ erred by failing to consider medical evidence, testimony, or other record evidence when making the disability determination or by failing to clarify any "discrepancies."

---

report in 2014 and stated that, at that time, she saw Plaintiff once a week. (Tr. 177-84.) Plaintiff's subsequent testimony that she lived with Darling in 2016 is not relevant to Darling's 2014 statement.

### 2. Plaintiff's SMI Determination

Plaintiff asserts that SMI determination meant that she was "totally disabled" but the ALJ stated that it had no binding effect on her social security proceeding. (Doc. 25 at 1-2, 13, 21.) The record reflects that the ALJ did not err in relation to the SMI determination. The ALJ noted that the record included an SMI determination form the Crisis Response Network ("CRN") and stated that she reviewed the determination. (Tr. 26.) The ALJ did not err in concluding that the SMI determination had no binding effect on the social security proceeding. *See Little v. Richardson*, 471 F.2d 715, 716 (9th Cir. 1972) (state determination of disability was not binding in proceedings on application for Social Security disability benefits); *see also Wilson v. Heckler*, 761 F.2d 1383, 1386 (9th Cir. 1985); 20 C.F.R. §§ 416.904. Additionally, a claimant's RFC and whether a claimant is disabled under the Act are issues reserved to the Commissioner. *See* SSR 96-5, 1996 WL 374183, at *2.

### 3. Disability Onset Date

Plaintiff complains about her representation at the administrative hearing. (Doc. 25 at 2.) Specifically, Plaintiff contends that her attorneys changed the disability onset date without consulting her.[15] (*Id*. at 2, 17.) The record reflects that Plaintiff initially alleged a disability onset date of October 20, 2012. (Tr. 14.) Through her representative at the administrative hearing, Plaintiff amended the onset date to March 11, 2014, the application date. (Tr. 14, 86.) Plaintiff's representative at the hearing stated that she had discussed the onset date with Plaintiff and they wanted to amend the onset date to the date of filing, March 12, 2014, because Plaintiff realized that that was the point she realized the severity of her conditions and took a more active role in her treatment. (Tr. 86.) Plaintiff was present at the hearing and did not indicate that she disagreed with the decision to amend the onset date. (*Id*.) Plaintiff does not offer any support for her conclusory assertion that

---

[15] Plaintiff also asserts that her attorneys advised her that they would continue to represent her if she lost at the administrative level but did not do so. (Doc. 25 at 2, 17.) Plaintiff does not explain how counsel's apparent decision not to pursue the appeal of her civil administrative case entitles her to relief in this proceeding.

1  she was not advised of the decision to amend the onset date.  (Doc. 25 at 2.)  Additionally,

2  Plaintiff does not explain why she is entitled to relief in this matter based on the decision

3  to amend the onset date.[16]

### 4.  Opportunity for Cross-Examination or Clarification

5  Plaintiff asserts that that ALJ did not give her representative an opportunity to rebut

6  or cross-examine the VE.  (Doc. 25 at 2, 24.)  The record reflects that the ALJ permitted

7  Plaintiff's representative to question the VE and that she did so.  (Tr. 98-99.)  Thus, the

8  record does not support Plaintiff's assertion.

9  Plaintiff also asserts that her answers to questions during the administrative hearing

10  "were not followed up on in an effort to learn more."  (Doc. 25 at 17.)  As an example,

11  Plaintiff cites the following portion of the administrative hearing transcript: "Q. Are you

12  looking for work?  A.  No.  Q. Why not? A. I'm trying to stay alive right now.  I'm on a

13  constant—wanting to kill myself from the time I wake up until I go to bed.  So right now,

14  I'm just trying to stay alive."  (Doc. 25 at 17 (quoting Tr. 88).)  This portion of the transcript

15  establishes that the ALJ followed up on Plaintiff's response to her question.  (Tr. 88.)

16  Specifically, when Plaintiff indicated that she was not looking for work, the ALJ asked her

17  to explain why.  (*Id.*)  Plaintiff has not established any error with respect to the development

18  of her testimony during the hearing.

### 5.  Questions Presented to the VE

20  Plaintiff asserts that the questions presented to the VE did not include all her medical

21  impairments.  (Doc. 25 at 23-24.)  The ALJ is not required to include in the RFC, and in

22  questions to the VE based on that RFC, limitations from evidence or testimony that has

23  been properly discounted.  *See Batson,* 359 F.3d at 1197; *Bayliss*, 427 F.3d at 1217.

24  Because Plaintiff has not shown that the ALJ erred in assigning weight to the medical

25  opinion evidence, Plaintiff's testimony, and lay witness statements, the ALJ did not err in

---

[16] In her reply, Plaintiff alleges that the change of onset date was a violation of due process. (Doc. 29 at 1.)  The Court will not consider issues raised for the first time in a reply.  *See Zamani*, 491 F.3d at 997.

formulating the RFC that was consistent with her assessment of the evidence and in asking questions to the VE based on that RFC. (Tr. 20, 96-98.)

### 6. Additional Evidence

Plaintiff states that she has collected additional evidence "for remand" including documents submitted to the Appeals Council, an updated SMI diagnosis, a mental RFC assessment that was completed after the administrative hearing, a statement from her ex-husband, pharmacy records, information about Darling's credentials as a nurse, school attendance records for Plaintiff's children, hospital records related to when Plaintiff had a concussion, paperwork related to 1998 "FMLA" leave from Plaintiff's ex-husband's employer, a certification from a health care provider stating that Plaintiff's diagnosis commenced in 1998 with a "lifetime duration," and a "family impact statement." (Doc. 25 at 25.) Plaintiff does not further describe this evidence or explain why the Court should remand this matter to the ALJ based on this evidence.

## VII. Conclusion

For these reasons, the Court concludes that the ALJ did not commit harmful legal error and that her determination is supported by substantial evidence in the record. Accordingly, the Court affirms the Commissioner's disability determination.

Accordingly,

**IT IS ORDERED** that the Commissioner's disability determination is **AFFIRMED**. The Clerk of Court is directed to enter judgment in favor of the Commissioner and against Plaintiff.

Dated this 28th day of January, 2019.

Bridget S. Bade
United States Magistrate Judge